RECEIVED
IN MONROE, LA

AUG 1 6 2010

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUIS.

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

ADAMS FAMILY TRUST                          CIVIL ACTION NO. 09-1625

VERSUS                                      JUDGE ROBERT G. JAMES

JOHN HANCOCK LIFE INSURANCE                 MAG. JUDGE MARK HORNSBY
COMPANY, ET AL.

## RULING

Pending before the Court are cross motions for summary judgment filed by Plaintiff Adams

Family Trust [Doc. No. 26] and Defendant John Hancock Life Insurance Company (U.S.A.) [Doc.

No. 22].  For the following reasons, Plaintiff's motion is DENIED, Defendant's motion is

GRANTED, and this case is DISMISSED WITH PREJUDICE.

## I.    FACTUAL AND PROCEDURAL HISTORY

This case arises from a dispute over a life insurance policy issued by Defendant to insure the

life of Mary Helen McGill Adams ("Adams").

In 2001, trustees of Plaintiff, Susan Adams Fordham ("Fordham") and Mary Kathryn Adams

Welch ("Trustees"), applied for a life insurance policy with Defendant.[1]  During the application

process, Trustees received a prospectus dated May 1, 2001, and a supplemental prospectus

(collectively "Prospectus") dated August 10, 2001.  The Prospectus described, in great detail, the

terms of a flexible premium variable life insurance policy.

On August 28, 2001, Trustees, on behalf of the Adams Family Trust, signed an application

and supplemental application for life insurance (collectively "Application").  The Application states

---

[1]Defendant was formerly known as The Manufacturers Life Insurance Company (U.S.A.).

that its terms will become part of the insurance policy once it is issued. The Application gave Trustees the option of choosing how often they would pay premiums. Trustees chose to pay premiums annually.

On August 31, 2001, Defendant issued Plaintiff a "Flexible Premium Variable Universal Life Insurance Policy" ("Policy"), effective August 24, 2001.[2] The Policy required that Plaintiff pay an initial premium and every month satisfy certain valuation tests in exchange for Defendant's promise to pay Plaintiff a varying amount upon the death of Adams. The Policy listed the "Planned Premium," an estimate of the amount of premium needed to keep the Policy from defaulting for a year, as $97,689.35. Plaintiff paid an initial premium of $108,818.62.

Defendant asserts that each year, approximately twenty-eight (28) days prior to the Policy anniversary date of August 24, it sent Trustees an "Annual Planned Premium Notice" ("Annual Notice"), setting forth the Planned Premium at the payment interval selected by Trustees. Fordham avers that she never received an Annual Notice. Regardless, because the Policy was a "flexible premium" policy, Plaintiff was under no obligation to make the indicated payment. Rather, Plaintiff could make premium payments "at any time and in any amount, subject to certain limitations" described in the Policy. Plaintiff could pay a greater or lesser amount of the premium at any time, and the Policy would not lapse if the Policy's accounts satisfied certain valuation tests. Failure to pay the premium did not necessarily mean that the Policy would lapse. Conversely, even if Plaintiff

---

[2]The Policy states: "The policy, application, supplementary benefits, and any endorsements form your whole contract. A copy of the application is attached to the policy and deemed a part of it."

paid the premium at the frequency chosen in the Application, the Policy could lapse.[3]  The remaining

premium after monthly deductions[4] were called "net premiums" and could be placed in a fixed

account or investment sub-accounts.

The Policy was in default if the "no-lapse guarantee"[5] provision of the Policy was not

satisfied and the "net cash surrender value"[6] was zero or less after monthly deductions were made.

---

[3]The Policy states: "This policy provides life insurance coverage for the lifetime of the
life insured if sufficient premiums are paid.  Premium payments in addition to the planned
premium shown may need to be made to keep this policy and coverage in force.  Changes in the
current cost of insurance rates; the amount, timing and frequency of the planned premium; the
interest rate being credited to the fixed account; the investment experience of the sub-accounts;
changes to the death benefit option; changes in the face amount; loan activity; and partial
withdrawals or monthly deductions for any supplementary benefits that apply and are attached to
this policy will affect the period of coverage.  Also refer to the policy termination provision of
your policy."

[4]Monthly deductions included a monthly administration charge, mortality and expense
risk charges, the cost of supplementary benefits added to the Policy, and the monthly cost of
insurance.

[5]The No-Lapse Guarantee provision provides: "[I]f the Net Cash Surrender Value falls to
zero or below, your policy will not go into default provided it satisfies the cumulative premium
test . . . . The test will be performed at the beginning of any Policy Month that your policy would
otherwise be in default in the absence of the No-Lapse Guarantee.  Your policy will satisfy the
test if the sum of the premiums paid, less any Policy Debt, and less any Gross Withdrawals taken
on or before the date of the test, is equal to or greater than the sum of the monthly No-Lapse
Guarantee Premiums due from the Policy Date to the date of the test."  The Planned Premium is
also the No-Lapse Guarantee Premium.  "Gross Withdrawal is the amount of partial Net Cash
Surrender Value [Trustees] request plus any Surrender Charge applicable to the withdrawal."

[6]The Net Cash Surrender Value is "the Cash Surrender Value less the Policy Debt."  The
Policy Debt "equals (a) plus (b) plus (c) minus (d), where:

(a)  is the total amount of loans borrowed as of such date;
(b)  is the total amount of any unpaid loan interest charges which have been borrowed
against the policy on a Policy Anniversary;
(c)  is any interest charges accrued from the last Policy Anniversary to the current
date; and
(d)  is the total amount of loan repayments as of such date."

3

If the Policy was in default on the twenty-fourth (24th) day of any month, Plaintiff had sixty-one (61) days to pay sufficient premiums to bring the Policy out of default, or the Policy terminated without value. Between 2002 and 2008, the Policy went into default twenty (20) times.[7] Each time, Defendant sent a "policy termination warning notice" ("Termination Warning") to Trustees. The Termination Warnings stated, among other things, that the premiums paid were insufficient to maintain the Policy past a certain date and that Plaintiff could pay a "minimum premium" to bring the Policy out of default and prevent the Policy from defaulting again for approximately three months from the date of the default that triggered the Termination Warning. The Termination Warnings stated that the minimum premium may not prevent the Policy from defaulting for three months because of fluctuations in the performance of Plaintiff's investment sub-accounts. Plaintiff was also given the option to pay an "additional premium" estimated to prevent the Policy from defaulting until the next Policy anniversary (i.e. the date the annual premium was due).

Pertinent to this suit, on August 24, 2008, the Policy went into default. On August 25, 2008, Defendant sent Trustees a Termination Warning, stating, in pertinent part:

> Your premium payments received to date are insufficient to maintain your coverage beyond Aug 24, 2008. To keep your valuable insurance in force, you may submit your premium payment in two installments:
>
> Minimum Premium of $26,913.19 by Oct 24, 2008 will continue your coverage until Nov 24, 2008.**

---

The Cash Surrender Value is "the Policy Value less the Surrender Charge and any outstanding Monthly Deductions due." The Policy Value is "the sum of the values in the Loan Account, the Fixed Account and the Investment Accounts."

[7]The Policy went into default on May 24, 2003; May 24, August 24, and November 24, 2004; February 24, May 24, August 24, and November 24, 2005; February 24, May 24, August 24, and November 24, 2006; February 24, May 24, August 24, and November 24, 2007; and February 24, May 24, August 24, and October 24, 2008.

4

> Additional Premium of $90,318.63 by Nov 24, 2008 will continue your coverage
> until Aug 24, 2009.**
>
> ** Please note that the amounts stated may be insufficient to carry your policy to the
> dates specified due to unit value fluctuation in the [investment] sub-accounts.

On October 22, 2008, Defendant received $26,913.19 from Plaintiff, the minimum premium stated

in the August 25, 2008 Termination Warning.  Although the minimum premium was estimated to

prevent the Policy from defaulting until November 24, 2008, because of an unexpected decline in

the value of Plaintiff's investment sub-accounts, the Policy went into default on October 24, 2008.

On October 24, 2008, Defendant sent Trustees another Termination Warning, stating, in pertinent

part:

> Our records indicate that your last payment of $26,913.19 was received on Oct 22,
> 2008.
>
> Your premium payments received to date are insufficient to maintain your coverage
> beyond Oct 24, 2008.
>
> To keep your valuable insurance in force, you may submit your premium payment
> in two installments:
>
> Minimum Premiums of $21,106.01 by Dec 24, 2008 will continue your coverage
> until Jan 24, 2009**
>
> Additional Premium of $71, 956.23 by Jan 24, 2009 will continue your coverage
> until Aug 24, 2009**
>
> Please disregard this notice if you have already sent us the amount requested on your
> most recent premium notice, and accept our thanks. Your next scheduled billing date
> is Aug 24, 2009
>
> ** Please note that the amounts stated may be insufficient to carry your policy to the
> dates specified due to unit value fluctuation in the [investment] sub-accounts.

Plaintiff did not make a payment in response to the Termination Warning, and Defendant asserts that

5

the Policy terminated on December 24, 2008.

Once the Policy terminated, Plaintiff could have applied to reinstate the Policy. To qualify for reinstatement, Plaintiff was required to send Defendant "evidence of insurability." On January 2, 2009, Defendant sent Trustees notice that the Policy terminated on December 24, 2008, and that Plaintiff may request that the Policy be reinstated. On January 12, 2009, Trustees sent Defendant an application for reinstatement, but did not disclose that Adams was admitted to a hospital in November 2008, had seizures in December 2008, and a stroke on January 10, 2009.

Adams died on February 7, 2009. Sometime thereafter, Defendant determined that Adams was not insurable at the time Plaintiff sent the application for reinstatement.

On August 7, 2009, Plaintiff filed suit against Defendant in state court. On September 16, 2009, Defendant removed the case to this Court. On June 4, 2010, Defendant filed a Motion for Summary Judgment. [Doc. No. 22]. On June 7, 2010, Plaintiff filed a Cross Motion for Summary Judgment. [Doc. No. 26].

## II.    LAW AND ANALYSIS

### A.    Summary Judgment Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty*

6

*Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). The nonmoving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255.

## B. Insurance Policy

Plaintiff asserts that the Policy did not terminate on December 24, 2008, and that Defendant owes Plaintiff death benefits under the Policy. Specifically, Plaintiff asserts that the frequency of premium payments in the Application refers to the frequency that variable premiums--payments that would prevent the Policy from lapsing--were due; that there was an "implied and modified agreement for billing variable premiums on a quarterly basis;" and that it was improper for Defendant to bill Plaintiff on October 24, 2008, because Plaintiff was not required to pay a fifth premium in 2008. In the alternative, Plaintiff asserts that the Policy should be reformed to conform with the parties' conduct of billing premiums quarterly.

Defendant asserts that the Policy terminated without value on December 24, 2008, because Plaintiff failed to pay sufficient premiums to bring the Policy out of default in response to the October 24, 2008 Termination Warning. Specifically, Defendant asserts "(1) There was never an agreement between the parties (implied or otherwise) that any policy premium associated with the

7

policy be billed quarterly; (2) [Defendant] billed all premiums in accordance with the terms of the [Policy]; and (3) the ultimate lapse of the Policy resulted from [Plaintiff's] failure to pay policy premiums as required under the terms of the [Policy]."

### 1. Frequency of Premium Payments

"As this is a diversity action regarding the interpretation of [an] insurance polic[y] issued in Louisiana, Louisana's substantive law controls." *Guidry v. Am. Pub. Life Ins. Co.*, 512 F.3d 177, 181 (5th Cir. 2007) (citation omitted). "Under Louisiana law, an insurance policy is a contract between the parties that must be construed in accordance with the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Id.* (quotation and citation omitted). "'Interpretation of a contract is the determination of the common intent of the parties,' LA. CIV. CODE art. 2045, and an insurance contract 'shall be construed according to the entirety of its terms and conditions'" (as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy). *Id.* (quoting LA. REV. STAT. § 22:881).

"Whether contract language is clear or ambiguous is a question of law." *Id.* (citation omitted). *Guidry*, 512 F.3d at 181. "The words of a contract 'are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning.'" *Id.* (quoting LA. CIV. CODE. art. 2047). "A contract is ambiguous . . . when it is uncertain as to the parties' intentions and susceptible to more than one reasonable meaning under the circumstances and after applying established rules of construction." *Lloyds of London v. Transcon. Gas Pipe Line Corp.*, 101 F.3d 425, 429 (5th Cir. 1996) (citing *Am. Druggists Ins. Co. v. Henry Contracting, Inc.*, 505 So.2d 734, 737 (La. App. 3 Cir. 1987)). "[This] rule . . . does not authorize a perversion of

8

language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists, nor does it authorize the court to make a new contract for the parties." *Badalamenti v. Jefferson Guar. Bank*, 99-1371 (La. App. 5 Cir. 4/25/00); 759 So.2d 274, 281. Furthermore, "[a]n insurance policy should not be interpreted in an unreasonable or a strained manner so as to enlarge or to restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion." *Id.* (citation omitted).

In resolving an ambiguity, "parole evidence is admissible to clarify the ambiguity and to show the intent of the parties." *Diefenthal v. Longue Vue Mgmt. Corp.*, 561 So.2d 44, 51 (La. 1990). "Ambiguit[ies] [may] be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." *Interstate Fire & Cas. Co.*, 93-C-0911 (La. 1/14/94); 630 So.2d 759, 764 (citation omitted). "The Court should construe the policy to fulfill the reasonable expectations of the parties in the light of the customs and usages of the industry." *Id.* (citation omitted). However, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." LA. CIV. CODE art. 2050. "[O]ne policy provision is not to be construed separately at the expense of disregarding other policy provisions." *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 93-C-0911 (La. 1/14/94); 630 So.2d 759, 763 (citing LA. CIV. CODE art. 2050). Furthermore, "[a] doubtful provision must be interpreted in light of . . . the conduct of the parties before and after the formation of the contract . . . ." LA. CIV. CODE. art. 2053. "[I]f after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." *Louisiana Ins. Guar. Ass'n*, 630 So.2d at 764 (citation omitted). The rule of strict

construction only applies "'[i]n case of doubt that *cannot otherwise be resolved.*'" *Id.* at 770 (quoting LA. CIV. CODE art. 2056).

It is undisputed that the terms of the Application were incorporated into the Policy. Paragraph nine (9) of the Application queries the applicant to select the frequency he or she wishes to pay "premiums" and receive premium notices. The heading of the paragraph is "premiums." Below the heading is "frequency:". The Applicant may select one of the following: "Annual," "Semi-Annual," "Quarterly," "Monthly - Billed," or "Monthly Pre-authorized Payment (Complete Form PS1610)." Plaintiff selected "Annual." Throughout the Policy, the term "premium" or "premiums" is used, including "Initial Premium," "Subsequent Premium," "No-Lapse Guarantee Premium," "Guideline Single Premium," "Guideline Level Premium," "Surrender Charge Premium," "Net Premium," "Premium Load," and "Planned Premium." Some of these phrases are specifically defined or assigned a specific monetary value in the Policy, while others are not. However, the Policy does not state what "premiums" means in the Application. The Court finds that the word "premiums" in the Application is ambiguous. Thus, the Court must consider whether interpretation of the term "premiums" to mean variable premiums that prevent the Policy from lapsing is reasonable. The Court finds that it is not reasonable under the rules of construction. Instead, the Court finds the term "premiums" in the Application refers to Planned Premiums.

Plaintiff's proposed construction would not be reasonable, nor consistent with Plaintiff's erroneous assumption that Termination Warnings are premium notices as stated in the Application. Termination Warnings were only sent to Trustees if the Policy went into default. The Policy could default on the twenty-fourth (24th) of any month if, among other things, the Net Cash Surrender Value was less than zero. Therefore, regardless of whether Trustees selected "Annual," "Semi-

10

Annual," "Quarterly," "Monthly - Billed," or "Monthly Pre-authorized Payment," Plaintiff could have received Termination Warnings and been required to pay premiums up to six or more times a year to prevent the Policy from lapsing. Adopting Plaintiff's construction would render paragraph nine (9) of the Application meaningless by making it impossible for Trustees to select the frequency premiums were due.

Plaintiff's proposed construction is also unreasonable because it is inconsistent with the conduct of the parties before and after the Policy was issued. Before submitting the Application, Plaintiff received a Prospectus from Defendant. The Prospectus described the Policy as follows:

> A Policy will be issued with a planned premium, which is based on the amount of premium the policyowner wishes to pay, **[Defendant] will send notices to the policyowner setting forth the planned premium at the payment interval selected by the policyowner.** However, the policyowner is under no obligation to make the indicated payment.

After the Policy was issued, Defendant sent Plaintiff twenty (20) Termination Warnings, specifically listing amounts Plaintiff must pay to bring the Policy out of default and prevent the Policy from defaulting again for a certain period of time. Notably, the Termination Warnings stated that "the amounts stated may be insufficient to carry your policy to the dates specified due to unit value fluctuation in the [investment] sub-accounts." Together, the Prospectus and Termination Warnings make clear that payment of the premiums listed in the Termination Warnings would not necessarily prevent the Policy from lapsing and that "premiums" in the Application referred to Planned Premiums as described in the Prospectus and the Policy. Therefore, Plaintiff's Cross Motion for Summary Judgment is denied on this claim.

### 2. *Reformation of the Policy*

Plaintiff asserts, in the alternative, that the Policy should be reformed to be consistent with

11

Plaintiff's primary assertion that premiums in the Application should be construed to mean variable premiums, and that payment of those premiums on a quarterly basis would prevent the Policy from lapsing.

"As other written agreements, insurance policies may be reformed if, through mutual error or fraud, the policy as issued does not express the agreement of the parties. In the absence of fraud, the party seeking reformation has the burden of proving a mutual error in the written policy." *Samuels v. State Farm Mut. Auto. Ins. Co.*, 2006-C-0034 (La. 10/17/06), 939 So.2d 1235, 1240 (internal quotation marks and citation omitted).

Plaintiff does not provide summary judgment-type evidence to show that Defendant committed fraud or that there was a mutual error in the Policy. Thus, there is no basis for the Court to reform the Policy, and Plaintiff's Cross Motion for Summary Judgment is also denied on this claim.

### 3. *Annual Notices*

Defendant asserts that the Policy lapsed on December 24, 2008, because Plaintiff failed to make a payment to bring the Policy out of default in response to the October 24, 2008 Termination Warning. Plaintiff, in essence, contends that the Policy did not lapse because Trustees did not receive Annual Notices.

Plaintiff fails to create a genuine issue of fact that it did not receive Annual Notices. Defendant submits evidence that it sends policyowners Annual Notices twenty-eight (28) days prior to each Policy anniversary and that Fordham sent Defendant a check in 2002 attached to the 2002 Annual Notice. Fordham avers that "[a]fter paying the initial premium on August 10, 2001, in advance, namely $108,816.62, no notice was ever received regarding any annual premium(s)."

12

However, Fordham's affidavit contradicts earlier deposition testimony where she stated that she did not recall whether she ever received an Annual Notice. "It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996) (citation omitted); *Love v. Motiva Enterprises LLC*, No. 08-30996, 2009 WL 3334610, at *2 (5th Cir. Oct. 16, 2009) ("[A]n affidavit in opposition to summary judgment that contradicts without explanation deposition testimony is properly disregarded."). The Court disregards Fordham's affidavit testimony to the extent that Fordham avers that Plaintiff did not receive Annual Notices.

Plaintiff also contends that the Policy did not lapse because, in response to the October 24, 2008 Termination Warning, it already "sent . . . the amount requested on [the] most recent premium notice," the August 24, 2008 Termination Warning. However, Plaintiff's argument is inconsistent with the undisputed facts. The October 24, 2008 Termination Warning stated: "Please disregard this notice if you have already sent us the amount requested on your most recent premium notice, and accept our thanks." Plaintiff confuses the August 24, 2008 Termination Warning, stating the amount Plaintiff must pay to bring the Policy out of default, with the Annual Notice setting forth the Planned Premium. Plaintiff should have known that "your most recent premium notice" did not mean the August 24, 2008 Termination Warning because the October 24, 2008 Termination Warning specifically stated that Defendant had received the minimum premium listed in the August 24, 2008 Termination Warning: "Our records indicate that your last payment of $26,913.19 was received on Oct 22, 2008."

The Court finds that the Policy went into default on October 24, 2008, and, in accordance with its terms, the Policy terminated without value sixty-one (61) days later because Plaintiff did not

"pay the amount . . . required to bring the policy out of default." Therefore, Defendant's Motion for Summary Judgment is GRANTED, and this case is DISMISSED WITH PREJUDICE.

**III. CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgment [Doc. No. 26] is DENIED, Defendant's Motion for Summary Judgment [Doc. No. 22] is GRANTED, and this case is DISMISSED WITH PREJUDICE.

MONROE, LOUISIANA, this _15_ day of August, 2010.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

14